IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF OKLAHOMA

MICHAEL EDWARD HOOPER,       )
                                       )
       Petitioner,           )
                                       )
vs.                               )     Case No. CIV-07-515-M
                                       )
RANDALL G. WORKMAN, Warden,   )
    Oklahoma State Penitentiary,   )
                                       )
       Respondent.[1]       )

## **MEMORANDUM OPINION**

Petitioner, Michael Edward Hooper, a state court prisoner currently incarcerated

pending the execution of three judgments and sentences of death, has filed a Petition for a

Writ of Habeas Corpus seeking relief pursuant to 28 U.S.C. § 2254. Doc. 21. This is

Petitioner's second appearance before this Court. In a prior habeas action, Case No. CIV-98-

1380-M, Petitioner challenged his convictions and sentences entered in Canadian County

District Court Case No. CF-93-601. Although the Court denied Petitioner habeas relief on

his convictions, it granted Petitioner relief from his death sentences. Finding that Petitioner

was denied the effective assistance of counsel in the second stage, the Court ordered the State

---

[1] When this action was commenced, Marty Sirmons was the warden of the Oklahoma State
Penitentiary and the properly named Respondent. However, Randall G. Workman is the current
warden of the Oklahoma State Penitentiary and the state officer having present custody of Petitioner.
Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Mr. Workman should be substituted
for Mr. Sirmons as the proper party Respondent. See Rule 2(a) of the Rules Governing Section 2254
Cases in the United States District Courts ("If the petitioner is currently in custody under a state-
court judgment, the petition must name as respondent the state officer who has custody.").

of Oklahoma to conduct a new sentencing proceeding. This decision was appealed to the Tenth Circuit by both parties and affirmed. Hooper v. Mullin, 314 F.3d 1162 (10th Cir. 2002). Petitioner's present Petition attacks the resentencing proceedings conducted by the state court in 2004. As a result of those proceedings, Petitioner once again received three death sentences.

In his Petition, Petitioner has presented five grounds for relief. Doc. 21. Respondent has responded to the Petition and Petitioner has replied. Docs. 31 and 34. In addition to his Petition, Petitioner also a filed motion for evidentiary hearing, which has been denied. Docs. 22 and 35. The state court record has been provided.[2] After a thorough review of the entire state court record, the pleadings filed herein, and the applicable law, the Court finds that, for the reasons set forth below, Petitioner is not entitled to his requested relief.

## I. History of the Case.

In December 1993, Petitioner killed his ex-girlfriend, Cynthia Jarman, and her two children, five-year-old Tonya and three-year-old Timmy. Petitioner shot each victim twice in the head and buried their bodies in a common grave. Hooper v. State, 947 P.2d 1090, 1096 (Okla. Crim. App. 1997). Petitioner was convicted by a jury of three counts of Murder in the First Degree. Petitioner received a sentence of death for all three counts. Id. at 1095-96.

---

[2] Relevant to the present action are the original record (O.R.) and the six transcripts of seven hearings held in connection with Petitioner's resentencing in 2004 (Tr.).

Petitioner's convictions and sentences were upheld by the Oklahoma Court of Criminal Appeals (hereinafter "OCCA"), id. at 1096, but, as noted above, this Court granted Petitioner relief from his death sentences. After this Court's decision was upheld by the Tenth Circuit, Hooper, 314 F.3d at 1178, Petitioner sought review by the United States Supreme Court. His petition for writ of certiorari was denied on October 6, 2003. Hooper v. Mullin, 540 U.S. 838 (2003).

Resentencing proceedings began February 5, 2004. On that day, Petitioner appeared with his habeas counsel, Mark Henricksen, before Canadian County District Judge Edward Cunningham. Judge Cunningham determined Petitioner to be indigent, issued an order appointing counsel, and set the matter for jury trial on September 13, 2004 (O.R. III, 606; Tr. 2/5/04, 2-6).

On March 19, 2004, Petitioner filed a pro se motion entitled "Motion for Negotiated Plea and Waiver of Rights." Acknowledging that he was proceeding against the advice of counsel, Petitioner requested the court to accept a guilty plea. In addition to his plea, Petitioner stated his desire to waive resentencing and any further appeals (O.R. IV, 608-11).

In response to Petitioner's motion, a hearing was held before Judge Cunningham on April 15, 2004. At this hearing, Petitioner appeared with court-appointed counsel, Mr. Henricksen and Julie Gardner. In accordance with Fluke v. State, 14 P.3d 565, 567 (Okla. Crim. App. 2000),[3] it was determined that Petitioner had to undergo an

---

[3] In Fluke, 14 P.3d at 567, the OCCA held that an independent competency evaluation is required in all death penalty volunteer cases.

independent competency evaluation before proceedings could continue (Tr. 4/15-16/04, 3-4).

To initiate this process, Mr. Henricksen filed an Application for Determination of Competency (O.R. IV, 614-16). Mr. Henricksen advised the court that he had disagreements with Petitioner on how to proceed, but that he was urging Petitioner to submit to the court-ordered competency evaluation as well as a second evaluation to be conducted by an defense-retained licensed psychologist (Tr. 4/15-16/04, 5). Judge Cunningham discussed with Petitioner the necessity of having a competency determination, and he urged Petitioner to follow the advice of his counsel and submit to both evaluations (Tr. 4/15-16/04, 5-7). Petitioner's response was as follows:

> Got no problems with the Court's recommendations. I mean, I have no problem complying with being seen by the Court's - - you know, whoever the Court orders. It's just - - it's the independent contracted from OIDS that I'd like to refute. I just don't feel that that's conducive to the results I seek.

(Tr. 4/15-16/04, 7). The next day, a second hearing was held. At that time, Judge Cunningham issued the order for a competency evaluation (O.R. IV, 622-23; Tr. 4/15-16/04, 14).[4] Mr. Henricksen advised the court that Petitioner was agreeable to the court-ordered evaluation and an evaluation by Dr. Jeannie Russell (Tr. 4/15-16/04, 13, 15).

On July 22, 2004, a post-examination competency hearing was held. Admitted as State's Exhibit 1 was the eight-page report from Dr. R. Shawn Roberson, Ph.D., Director of Psychology, Oklahoma Forensic Center, regarding his evaluation of Petitioner on June 21,

---

[4] A second order for competency evaluation was issued on April 27, 2004, due to the unavailability of the initially selected mental health evaluator (O.R. IV, 626-28).

2004 (Tr. 7/22/04, 3-4) (hereinafter cited as "Report of Dr. Roberson"). Dr. Roberson

concluded as follows:

> [Petitioner] did not present with any symptoms of mental illness or a cognitive
> disorder that impaired his ability to appreciate the nature of his conviction or
> the potential penalties involved in sentencing. It is this examiner's opinion
> that he is fully able to understand the nature of the resentencing procedure. He
> can participate in legal proceedings and conform his behavior to the
> requirements of the courtroom, if he chooses to do so. He is fully capable of
> discussing information related to his legal case and participating in his
> allocution. He had a very favorable opinion of his attorney and is able to
> discuss information regarding his case and rationally assist with the
> development of legal strategy for resentencing.

(Report of Dr. Roberson, pp. 7-8). Although Petitioner had been evaluated by Dr. Russell

in May 2004, and was given the opportunity to present her evaluation, it was not presented.

With respect thereto, Mr. Henricksen advised the court, "I'm accepting this conclusion by

Dr. Roberson, at least to the extent that I have no evidence presently available to me with

which to contradict it" (Tr. 7/22/04, 4-7).[5] Judge Cunningham found Petitioner competent

to proceed (Tr. 7/22/04, 7-8).

Inquiry was then made as to whether Petitioner wanted a jury trial. Mr. Henricksen

told the court that Petitioner had been advised to assert his right to trial by jury; however,

Petitioner had indicated his desire to proceed against the advice of counsel (Tr. 7/22/04, 8-

10). Mr. Henricksen stated, "I strongly hope that he will change his mind and allow us to

---

[5] Dr. Russell's 2004 report is not a part of the record; however, in her subsequent 2005 report, Dr. Russell notes that in 2004 she "found [Petitioner] able to appreciate the charges against him and to rationally assist in his defense." A copy of Dr. Russell's 2005 report is contained in Exhibit One to the Petition (hereinafter cited as "2005 Report of Dr. Russell").

proceed" (Tr. 7/22/04, 10). Judge Cunningham addressed the question to Petitioner directly. Petitioner requested a non-jury trial on September 8th (Tr. 7/22/04, 10-11). Judge Cunningham advised Petitioner that if he changed his mind, it would be allowed and the matter would be set for jury trial on April 4, 2005 (Tr. 7/22/04, 11-12).

Prior to the hearing on September 8th, Petitioner's counsel filed a pleading entitled "Defendant's Tender of Mitigation Evidence." In this pleading, counsel detailed the evidence available for the development of a mitigation case (O.R. X, 1681-96). Therein, counsel stated, "[Petitioner] has demanded that he not be subjected to [ ] further re-sentencing proceedings in front of a jury" (O.R. X, 1682). Counsel further stated:

> [Petitioner] has further forbidden counsel for [Petitioner] from introducing any evidence which might tend to mitigate this court's or a jury's imposition of a sentence other than death. [Petitioner] has refused to submit to further diagnostic tests for mental health experts and has fully impeded the development of the mitigation which might persuade this court or a jury to impose a sentence other than death in these three first degree murder charges.

(O.R. X, 1682).

Judge Cunningham, after noting that he had previously found Petitioner to be competent, began the September 8th hearing by questioning Petitioner about his right to a jury trial and his right to present mitigating evidence. Petitioner reaffirmed that he did not want a jury sentencing proceeding and that he understood his right to present mitigation evidence (Tr. 9/8/04, 3-5). Judge Cunningham then asked Mr. Henricksen if he was satisfied that Petitioner understood his right to present mitigation evidence. While acknowledging his belief that Petitioner suffers from serious mental illness, Mr. Henricksen described

Petitioner's current state as "perfectly cordial." Reluctantly, Mr. Henricksen advised the court that he believed that Petitioner "understands the nature, purpose, and consequence of this hearing and the consequences of what he's doing today" (Tr. 9/8/04, 5-6). In compliance with Wallace v. State, 893 P.2d 504, 512-513 (Okla. Crim. App. 1995),[6] Judge Cunningham continued to question Petitioner about the nature of mitigation evidence, his right to present it, and the three possible punishments he faced. Petitioner continually affirmed his understanding of his rights and the sentencing process. He told the court that he had thought about it for ten years, that no one was forcing him to make this decision, and that he had consulted with his counsel and family about it (Tr. 9/8/04, 6-9).

Mr. Henricksen continued to urge Petitioner to change his mind and request a jury trial. Mr. Henricksen discussed how the preparation of a mitigation case had been thwarted by Petitioner's directive to counsel not to bother his family, friends, and teachers, and his refusal to submit to mental health testing beyond what was required to establish his competency (Tr. 9/8/04, 9-11). Judge Cunningham told Petitioner that the failure to present mitigation evidence could result in him receiving the death penalty. Petitioner stated that he understood, and he acknowledged that he had not allowed his counsel to contact witnesses on his behalf. Petitioner made this statement even after Judge Cunningham told him that he felt sure that Petitioner's friends and family would willingly help him (Tr. 9/8/04, 11-12).

---

[6] In Wallace, 893 P.2d at 508, the OCCA held that a defendant can waive the presentation of mitigating evidence. Wallace sets forth guidelines to be followed in this situation. Id. at 512-13. The guidelines "ensure the defendant has an understanding of his or her rights. . . ." Id. at 512.

At the conclusion of this questioning, Judge Cunningham asked Petitioner whether he wanted to give up his right to present mitigation evidence. Petitioner answered affirmatively, acknowledging that he had visited with his attorneys about it several times and knew that his decision was against their advice (Tr. 9/8/04, 12). Then the following exchange occurred:

> MR. HENRICKSEN: Michael, would delaying this any further if the Court were even to consider it - - I've tried to emphasize to you what a deadline today is. You know there can't be a bigger decision in one person's life. Would a little more time help you?

> [PETITIONER]: No. I think I've had sufficient time.

> THE COURT: Before you respond to that question, I will advise you, if we need to have more time, I will grant you more time. I'm not going to rush through this. But if we need more time, if you need to visit with anybody else, if you want to visit with your counsel, we'll do that.

> [PETITIONER]: Well, I do appreciate and I understand, but we've discussed this many times, and my decision stands.

(Tr. 9/8/04, 13-14). Judge Cunningham then asked Petitioner again about a jury sentencing. Petitioner affirmed that he wanted the court to conduct his sentencing (Tr. 9/8/04, 14).

Before making his findings as to waiver, Judge Cunningham wanted Petitioner to listen to and consider the evidence that the State wanted to the court to consider, as well as the evidence that his counsel wanted the court to consider. After this discussion, Judge Cunningham asked defense counsel if they needed to visit any further with their client. Petitioner himself answered, "Thank you. No, Your Honor" (Tr. 9/8/04, 14-21). Then, after some further discussion with counsel, Judge Cunningham found as follows:

[T]he Court at this time would find that [Petitioner] is competent based on the record that is made since the remand coming back; that he is competent at this time to understand the nature, purposes, and consequences of this proceeding; that [Petitioner] in open court has affirmatively waived his right to have this matter presented to a jury; that [Petitioner] has affirmatively requested that this Court reconsider the sentencing in this matter; that [Petitioner] has, with the record being made, prohibited, kept, his counsel from calling any further witnesses for sentencing considerations; that [Petitioner's] tender is a tender of mitigation evidence of what [Petitioner] could have or would have presented had [Petitioner] allowed his counsel to present that to the Court . . . .

. . . .

[T]hat [Petitioner] understands the possibility of the assessment of the death penalty on one or all of these counts, that [Petitioner] fully understands and is competent to understand and appreciate the difference between a death penalty and a life in prison without parole, or a life in prison, and that he is competent to make those determinations and in assisting his counsel.

(Tr. 9/8/04, 27, 29). The matter was then continued until September 30th so that Judge Cunningham could have sufficient time to review the evidence requested by the parties and make his decision. Before concluding, however, Judge Cunningham left open the opportunity for Petitioner to change his mind and proceed with a jury sentencing (Tr. 9/8/04, 27-28, 33-34).

Judge Cunningham began the September 30th sentencing hearing by once again addressing the issue of Petitioner's competency. Judge Cunningham was advised that since the last hearing, Petitioner had seen a mental health provider at the prison. He was told that there had been some consideration of prescribing Petitioner some medication for his chronic depression, but that currently Petitioner was not taking any medication that would affect his judgment. When Mr. Henricksen was asked about Petitioner's competency, he replied, "I

remain persuaded that [Petitioner] suffers from chronic and serious depression, but that I cannot, as an officer of the Court, state that I do not think he is competent to participate in these court proceedings, albeit suffering from mental illness." The court then found as follows:

> Again, based on the record that has previously been made, based on my observations of [Petitioner], his obvious thought process and the responses he has given to the Court, at this time this Court would find that [Petitioner], is, in fact, competent to assist counsel and to understand the nature, purpose, and consequence of these proceedings . . .

(Tr. 9/30/04, 3-6).

Next, Judge Cunningham revisited the matter of a jury trial. Although Petitioner had waived his right to a jury trial at the prior hearing, Judge Cunningham stated, "Again, I advise counsel, if [Petitioner] wishes to exercise his right to a jury trial, I will not rush through this, I will back this process up, and we will allow a jury trial at the earliest opportunity" (Tr. 9/30/04, 6-7). Judge Cunningham then asked Petitioner directly if he wanted to exercise his right to a jury trial. Petitioner responded:

> In light of the facts, many that have been fabricated and grossly distorted, I don't see it necessary to dredge up these things and drag my family, the victim's family, or myself through the presentation of such. So I would prefer that you sort through the relevant material and pronounce whatever sentence you deem appropriate. I'm still standing on that.

(Tr. 9/30/04, 7). Petitioner affirmed his decision to waive jury sentencing and stood on his previously filed motion for plea and waiver of rights (Tr. 9/30/04, 7-9).

After making a record of what evidence had been reviewed in preparation for Petitioner's sentencing, including the testimony of Petitioner's parents presented in mitigation in his prior trial, Judge Cunningham questioned Petitioner once again about his right to present mitigation evidence. Petitioner acknowledged what his counsel desired to do with respect to mitigation, but he affirmed that he wanted no further action taken (Tr. 9/30/04, 9-12). Mr. Henricksen also stated once again that it was his "lay opinion" that Petitioner was suffering from severe depression; however, he did "not believe that [Petitioner] is incompetent in a legal sense. . . ." The court found Petitioner competent to waive the presentation of any further mitigation evidence (Tr. 9/30/04, 12-14).

To insure complete compliance with <u>Wallace</u>, 893 P.2d at 512-513, Judge Cunningham engaged Petitioner in an even more extensive dialogue about his decision, the nature of mitigation evidence, his right to present it, and the three possible punishments he faced. He then made the following findings:

> I do believe that [Petitioner] understands the difference between mitigating and aggravating circumstances, that [Petitioner] understands his right as a matter of law to present mitigating evidence, that [Petitioner] has had the advice of counsel who have advised him to be allowed to present their evidence, further evidence, and to delve further into it before presentation pursuant to the tender of mitigation evidence as filed for record on September 8th.
>
> I am satisfied that he understands this process of mitigating versus aggravating circumstances and evidence in support of both the position of the State and [Petitioner]. I've asked him three or four times. I think, based on my observations of [Petitioner], that he understands this situation, and that, against legal advice, it is his direction to his counsel not to present, delve into further or present, the mitigating evidence that counsel wish to present. I think he understands the importance of mitigating evidence. I think he understands

that failure to present that mitigating evidence could result in the imposition of one, two, or three death penalties. I think he understands the permanency, based on questioning in a prior hearing on this matter, as well as his responses today of the difference between life in prison, life in prison without parole, and death being final.

I would make those as findings of facts in support of my determination that he is competent to waive the presentation of mitigating evidence, as well as to proceed further with this hearing.

(Tr. 9/30/04, 14-22). But even after this, Judge Cunningham advised Petitioner that in a prior case like Petitioner's, he had sentenced a man to death and in fact attended his execution. With this knowledge, Judge Cunningham asked Petitioner again if he wanted to halt proceedings and pursue a mitigation case. Petitioner replied, "No, I do not" (Tr. 9/30/04, 22-23).

After hearing argument from counsel, the hearing was recessed for lunch and then Judge Cunningham returned with his ruling (Tr. 9/30/04, 25-41). Judge Cunningham resentenced Petitioner to death on three counts of Murder in the First Degree (Tr. 9/30/04, 42-54). On Count I, the murder of Cynthia Lynn Jarman, Judge Cunningham found two aggravating circumstances supporting the death sentence, namely: (1) Petitioner knowingly created a great risk of death to more than one person; and (2) the existence of a probability that Petitioner would commit criminal acts of violence that would constitute a continuing threat to society (Tr. 9/30/04, 42-44). On Counts II and III, the murders of Cynthia Lynn Jarman's children, Tonya Kay Jarman and Timmy Glen Jarman, Judge Cunningham found the same aggravators supporting Count I, plus the additional aggravator that the murders

were committed for the purpose of avoiding or preventing a lawful arrest or prosecution (Tr. 9/30/04, 44-49).

Formal sentencing was held on October 27, 2004. Again, at the beginning of the hearing, Judge Cunningham inquired of Petitioner's competence to proceed and his understanding of his rights (Tr. 10/27/04, 3-13). Finding Petitioner competent, the death warrants were then read (Tr. 10/27/04, 13-34). Petitioner then presented the court with a declaration which read:

> I hereby acknowledge that my counsel has advised me of my rights of appeal. I am fully informed that in light of having received three sentences of death by lethal injection, that this sentence is subject to mandatory review by the Oklahoma Court of Criminal Appeals. However, I confirm that I have directed my counsel not to file any other appeals, including a direct appeal nor a post-conviction challenge.

(O.R. X, 1724; Tr. 10/27/04, 34-35). In accordance with <u>Grasso v. State</u>, 857 P.2d 802, 806 (Okla. Crim. App. 1993),[7] Judge Cunningham then proceeded to question Petitioner about the declaration and his understanding of his appellate rights. He then found him competent and the waiver to be knowing and intelligent: "I find, specifically, that [Petitioner] has the understanding and the capacity, as a legal stance, to understand the

---

[7] In <u>Grasso</u>, the OCCA adopted the following standard to be applied in cases where a capital defendant seeks to waive his direct appeal right:

> [A] defendant sentenced to death will be able to forego a state appeal only if he has been judicially determined to have the capacity to understand the choice between life and death and to knowingly and intelligently waive any and all rights to appeal his sentence.

<u>Grasso</u>, 857 P.2d at 806 (quoting <u>Franz v. State</u>, 754 S.W.2d 839, 843 (Ark. 1988)).

difference between life and death and to knowingly and intelligently, realizing it is against his counsel's advice, but he has the right to waive his statutory right to a direct appeal. . ." (Tr. 10/27/04, 35-40). The declaration was then executed by Petitioner and filed of record (O.R. X, 1724; Tr. 10/27/04, 40).

In Case No. D-2004-1098, the OCCA reviewed Petitioner's resentencing proceedings. In a published opinion, Hooper v. State, 142 P.3d 463 (Okla. Crim. App. 2006), the OCCA found no error warranting relief.[8] Petitioner sought review of the OCCA's decision by the United States Supreme Court. His petition for writ of certiorari was denied on March 26, 2007. Hooper v. Oklahoma, 549 U.S. 1309 (2007).

## II. Standard of Review.

### A. Exhaustion as a Preliminary Consideration.

The exhaustion doctrine is a matter of comity. It provides that before a federal court can seek to grant habeas relief to a state prisoner, it must first determine that he has exhausted all of his state court remedies. As acknowledged in Coleman v. Thompson, 501 U.S. 722, 731 (1991), "in a federal system, the States should have the first opportunity to address and correct alleged violations of state prisoner's federal rights." While the

---

[8] The OCCA conducts a mandatory sentence review for all cases in which the death penalty is imposed. This review cannot be waived. Okla. Stat. tit. 21, § 701.13 (2001); Fluke, 14 P.3d at 567. In conducting a mandatory sentence review, the OCCA is tasked to determine whether (1) "the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor" and (2) "the evidence supports the jury's or judge's finding of a statutory aggravating circumstance." Okla. Stat. tit. 21, § 701.13(C) (2001).

exhaustion doctrine has long been a part of habeas jurisprudence, it is now codified in 28 U.S.C. § 2254(b). Pursuant to 28 U.S.C. § 2254(b)(2), "[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."

**B.** **Procedural Bar.**

Beyond the issue of exhaustion, a federal habeas court must also examine the state court's resolution of the presented claim. "It is well established that federal courts will not review questions of federal law presented in a habeas petition when the state court's decision rests upon a state-law ground that 'is independent of the federal question and adequate to support the judgment.'" Cone v. Bell, ___ U.S. ___, 129 S.Ct. 1769, 1780 (2009) (quoting Coleman). "The doctrine applies to bar federal habeas when a state court declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement." Coleman, 501 U.S. at 729-30.

**C.** **Merits.**

In accordance with the Antiterrorism and Effective Death Penalty Act of 1996 (hereinafter "AEDPA"), the Court's ability to grant habeas corpus relief to state prisoners is limited. When a state prisoner presents a claim to this Court, the merits of which have been addressed in state court proceedings, the Court cannot grant habeas corpus relief upon the claim unless it determines that the state court proceedings resulted in a decision (1) "that was contrary to, or involved an unreasonable application of, clearly established

Federal law, as determined by the Supreme Court of the United States" or (2) "that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

The focus of Section 2254(d) is on the reasonableness of the state court's decision. To obtain relief, a petitioner must show that the state court decision is "objectively unreasonable." Williams v. Taylor, 529 U.S. 362, 409 (2000) (O'Connor, J., concurring but delivering the opinion of the Court with respect to Part II). "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable - a substantially higher threshold." Schriro v. Landrigan, 550 U.S. 465, 473 (2007).

"Under § 2254(d), a habeas court must determine what arguments or theories supported . . . the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." Harrison v. Richter, ___ U.S. ___, 131 S.Ct. 770, 786 (2011). Relief is warranted only "where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents." Id. The deference embodied in Section 2254(d) "reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." Id. (citation omitted).

### III. Analysis.

**A.      Ground One.**

In his Ground One, Petitioner challenges the adequacy of Oklahoma's procedures to determine his competence and his ability to make knowing and intelligent waivers of his right to jury trial, right to present mitigation evidence, and right to appeal.  Petitioner asserts that Oklahoma's procedures do not comport with the standard set forth in Rees v. Peyton, 384 U.S. 312 (1966).  Although the OCCA found that its "requirements ensure that a capital defendant's waiver of rights comports with the general standard set forth [in Rees]," Hooper, 142 P.3d at 466, Petitioner disagrees, and asserts that the failure to employee the Rees' standard resulted in an inconsistent determination that he was competent to waive his constitutional rights, despite his depression.  Petitioner claims that he is entitled to relief under Section 2254(d) because the OCCA's decision is both contrary to and an unreasonable application of Rees and based on an unreasonable determination of the facts.  Respondent contends that Petitioner has failed to satisfy the requirements of Section 2254(d) and should therefore be denied relief.

**1.      The Rees Standard.**

In Rees, a capital defendant seeking review of the denial of habeas relief sought to withdraw his petition for certiorari.  Given questions about his competency, the Supreme Court directed the district court to determine the issue.  Rees, 384 U.S. at 312-14.  Specifically, the district court was instructed to determine "whether he has capacity to

appreciate his position and make a rational choice with respect to continuing or abandoning further litigation or on the other hand whether he is suffering from a mental disease, disorder, or defect which may substantially affect his capacity in the premises." Id. at 314.

In Godinez v. Moran, 509 U.S. 389 (1993), a case which held that the standard used to determine a defendant's competence to stand trial, Dusky v. United States, 362 U.S. 402 (1960),[9] is the same standard which applies to a defendant's competence to plead guilty or waive the right to counsel, the Supreme Court noted that the phrase "rational choice" as used in Rees means the same as "rational understanding" as used in Dusky. Godinez, 509 U.S. at 398 n.9. Although the Rees standard differs from the Dusky standard, "both standards inquire about the discrete capacity to understand and make rational decisions concerning the proceedings at issue. . . ." Mata v. Johnson, 210 F.3d 324, 329 n.2 (5th Cir. 2000).

## 2. Oklahoma's Procedures.

As noted above, the OCCA found that Oklahoma's procedures comport with Rees. Hooper, 142 P.3d at 466.

> This Court has carefully scrutinized cases in which a defendant essentially volunteers for the death penalty, by waiving his rights to a jury trial, presentation of mitigating evidence, and direct appellate review. We have developed a strict procedure which must be followed in such cases. This is ultimately designed to ensure that the defendant has the capacity to understand

---

[9] In Dusky, the Supreme Court held that a defendant is competent to stand trial if he has (1) "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and (2) "a rational as well as factual understanding of the proceedings against him." Dusky, 362 U.S. at 402 (internal quotations omitted).

the choice between life and death, and to knowingly and intelligently waive his right to appeal his sentence. Our requirements ensure that a capital defendant's waiver of rights comports with the general standard set forth by the United States Supreme Court to determine whether a capital defendant may end his appeals: "whether [the defendant] has capacity to appreciate his position and make a rational choice with respect to continuing or abandoning further litigation or on the other hand whether he is suffering from a mental disease, disorder, or defect which may substantially affect his capacity in the premises."

Id. (footnotes omitted) (quoting <u>Rees</u>). The OCCA detailed its procedures as follows:

Before permitting a waiver of the rights to jury trial and to present mitigating evidence, the trial court must order an independent competency evaluation. After making the determination that a defendant is competent to waive a jury trial, a trial court must follow several steps to ensure a defendant is knowingly and intelligently waiving the presentation of mitigating evidence.

(1) The court must inform the defendant of the right to present mitigating evidence, and what mitigating evidence is.

(2) The court must inquire both of the defendant and his attorney (if not pro se) whether he or she understands these rights.

(3) The court should also inquire of the attorney if he or she has attempted to determine from the defendant whether there exists any evidence which could be used to mitigate the aggravating circumstances proven beyond a reasonable doubt by the prosecution.

(4) If such information has been given, the attorney must advise the court what that mitigating evidence is; if the defendant has refused to cooperate, the attorney must relate that to the court.

(5) The trial court must inquire of a defendant and make a determination on the record whether the defendant understands the importance of mitigating evidence in a capital sentencing scheme, understands such evidence could be used to offset the aggravating circumstances proven by the prosecution in support of the death penalty, and the effect of failing to present that evidence.

(6) After being assured the defendant understands these concepts, the court must inquire of the defendant whether he or she desires to waive the right to present such mitigating evidence.

(7) Finally, the court should make findings of fact pursuant to Grasso of the defendant's understanding and waiver of rights.

Id. (footnotes omitted) (citing Fluke, 14 P.3d at 567, Wallace, 893 P.2d at 512-13, and Grasso, 857 P.2d at 806). The OCCA complimented Judge Cunningham for "scrupulously follow[ing] these steps." Id.

### 3. Trial Court's Determination of Petitioner's Competence.

The independent competency evaluation ordered by the court directed Dr. Roberson to answer the following five questions:

(1)  Is [Petitioner] able to appreciate the nature of the charges against him?

(2)  Is [Petitioner] able to consult with his lawyer and rationally assist in the preparation of his defense?

(3)  If the answer to question (1) or (2) is no, can [Petitioner] attain competency within a reasonable time if provided with a course of treatment, therapy, or training?

(4)  Is [Petitioner] a mentally ill person requiring treatment as defined by Section 1-103 of Title 43A of the Oklahoma Statutes?

> (5)     If [Petitioner] were released without treatment, therapy, or training, would he probably pose a significant threat to the life or safety of himself or others?

(O.R. IV, 627).[10]

Dr. Roberson answered the first question in the affirmative. He supported his conclusion as follows:

> [Petitioner] was well aware he was convicted of three counts of Murder in the First Degree, and he understood the behavioral accusations against him. He knew he was ordered for resentencing in this case, and he listed three possible sentences he could receive, including "death penalty, life without parole, and life." He clearly understood the seriousness of his situation and the potential penalties he could receive. [Petitioner] was motivated for a favorable resolution to his case. However, he stated that when left with only two choices (i.e., life in prison vs. the death penalty), he would prefer execution. [Petitioner] cited numerous reasons for his belief that it would be better to be executed than to spend the rest of his life in prison, such as his relationships with other inmates, potential negative situations that could arise, etc. He voiced no delusional beliefs (fixed false beliefs despite evidence to the contrary) regarding what would occur were he executed. He understood it would result in his physical death, although he noted that he was a Christian and believed in an afterlife. [Petitioner] did not present with any symptoms of mental illness or cognitive impairment that precluded his ability to appreciate the nature of his conviction or the potential penalties involved in sentencing.

(Report of Dr. Roberson, p. 3).

Dr. Roberson answered the second question in the affirmative as well. Dr. Roberson concluded that Petitioner understood the nature of the resentencing proceeding. Petitioner

---

[10] In correspondence from the court, Dr. Roberson was provided with most of the background information upon which he relied in conducting his evaluation (O.R. IV, 634-702; Tr. 7/22/04, 7). In addition to this information, Dr. Roberson personally interviewed Petitioner. This interview and evaluation occurred on June 21, 2004, and lasted an hour and thirty-five minutes (Report of Dr. Roberson, p. 1).

told Dr. Roberson "that his attorney had two options for legal strategy in the resentencing, and [he] provided a logical description for those options, as well as excellent definitions for basic legal roles. . . ." Dr. Roberson noted that Petitioner's behavior was "very well controlled" and he had average cognitive ability. Petitioner told Dr. Roberson that he trusted his legal counsel and he complimented Mr. Henricksen's lawyering skills. Petitioner acknowledged that Mr. Henricksen disagreed with his position to forego sentencing and request the death penalty and had urged him to discontinue this course (Report of Dr. Roberson, pp. 3-4). Given his affirmative answers to the first two questions, the third question was inapplicable (Report of Dr. Roberson, p. 4).

Dr. Roberson answered the fourth question in the negative. After discussing his review of the testimony given by Dr. J. R. Smith at an evidentiary hearing in 2001 regarding a prior mental health evaluation of Petitioner, Dr. Roberson detailed the findings of his own evaluation (Report of Dr. Roberson, pp. 4-6). Therein, Dr. Roberson noted the following:

> [Petitioner] described his recent mood as "pretty good." He stated he had not cried in a very long time, although he occasionally felt sad. He reported no impairment in sleep, energy level, or appetite. He stated he routinely performed exercises and yoga to maintain fitness. [Petitioner] estimated he slept between 5-6 hours each night. He conveyed that he "gave up hope" when he received a resentencing and not a retrial, but he did not endorse any substantial symptoms of depression or anxiety at the current time. He did not evidence or display any symptoms of mania, such as hyperactivity, decreased need for sleep, increased thought processes, elevated mood or pressured speech. [Petitioner] denied any history of auditory or visual

22

hallucinations (sensory experiences in the absence of external stimuli). He did not voice any paranoid or delusional ideations.

(Report of Dr. Roberson, p. 6). Dr. Roberson concluded that Petitioner was not in need of inpatient psychiatric treatment because

[he] evidenced no signs, and endorsed no history of, symptoms of psychosis. He did not endorse any history of substantial manic symptoms. He stated he had suffered from depression and anxiety in the past, but currently, denied such problems and his affect appeared euthymic (normal). [Petitioner] reported no history of treatment for a serious mental illness or cognitive defects. His intellectual functioning appeared to be at least in the Average Range based on his responses throughout the evaluation.

(Report of Dr. Roberson, p. 6).

The final question was answered in the negative as well. Although Petitioner told Dr. Roberson of a prior suicide attempt when he was a child, "[h]e denied any current suicidal ideations and denied any plans to harm himself." Petitioner did suggest that he might consider suicide if he received a sentence other than death. Dr. Roberson noted that this situation should be monitored (Report of Dr. Roberson, p. 7).

Dr. Roberson's ultimate conclusion was that Petitioner was competent. Petitioner did not show any signs of mental illness or cognitive impairment. With average intellectual functioning, he had an understanding of the proceedings and was capable of assisting counsel in legal discussions (Report of Dr. Roberson, pp. 7-8).

At the post-examination competency hearing, Dr. Roberson's report was admitted and the State relied upon the same to demonstrate Petitioner's competence to proceed. Aware that Petitioner had been evaluated by his own expert, the court asked if Petitioner had a report to

present for the court's consideration.  Mr. Henricksen advised that the defense had no

evidence to present and that it accepted Dr. Roberson's findings because it had no evidence

with which to challenge it (Tr. 7/22/04, 4, 6-7).  Although Petitioner had in fact had his own

evaluation done, evidence of the evaluation was not presented because the results were

consistent with Dr. Roberson's findings.

On May 10, 2004, Dr. Russell met with Petitioner for three hours.  She interviewed

him and conducted two competency tests, The MacArthur Competence Assessment Tool -

Criminal Adjudication (MACCAT-CA) and the Georgia Court Competency Test - Revised

1992 (GCCT).  In addition, she reviewed the following mental health records:

> Psychotherapy Notes for the period beginning August 18, 1992 through
> May 25, 1993 - Richard A. Carothers, Ph.D.
>
> MCMI-III computer generated report dated May 27, 1997
>
> Neuropsychological test data from Dr. Adams report dated April 2, 1993
>
> Review of transcript of testimony of Dr. J. R. Smith and Dr. Phillip Murphy
>
> Neuropsychological Evaluation by Phillip Murphy, Ph.D. dated September 29,
> 1996
>
> Neuropsychological Evaluation by Russell L. Adams, Ph.D. dated April 2,
> 1993
>
> Report on testing by Vesta S. Gettys, Ph.D. dated June 18, 1997 including:
> Minnesota Multiphasic Personality Inventory - 2 (MMPI-2), Adult

Basic Learning Examination, Level 2 (ABLE), Bender-Gesalt, and
Millon Clinical Multiaxial Inventory (MCMI-II)

(O.R. X, 1689). Consistent with Dr. Roberson, Dr. Russell also concluded that Petitioner

was competent (2005 Report of Dr. Russell, pp. 1, 3-4).

In addition to these mental health evaluations, Petitioner's counsel, Mr. Henricksen,

asserted throughout the 2004 proceedings that, although Petitioner was, in his lay opinion,

depressed, he was nevertheless competent (Tr. 9/8/04, 5-6; Tr. 9/30/04, 5; Tr. 10/27/04, 4-5).

See Bryson v. Ward, 187 F.3d 1193, 1201 (10th Cir. 1999) ("Defense counsel is often in the

best position to determine whether a defendant's competency is questionable."). Moreover,

Petitioner appeared before Judge Cunningham seven times from February 2004 to

October 2004. Judge Cunningham had extensive interaction with Petitioner as he repeatedly

advised Petitioner of his rights, questioned his understanding of his rights, and determined

that Petitioner was competent to proceed and make knowing and intelligent waivers of his

constitutional rights (Tr. 7/22/04, 8; Tr. 9/8/04, 27, 29; Tr. 9/30/04, 6, 13-14, 51-52;

Tr. 10/27/04, 10-11, 37-40). See United States v. Cornejo-Sandoval, 564 F.3d 1225,

1234 (10th Cir. 2009) (noting that a court's observation of a defendant's "behavior and

demeanor are crucial to any proper evaluation of a cold appellate record").

## 4.     Analysis.

Despite all this evidence of his competency, including that of his own expert,

Petitioner asserts, as he did to the OCCA, that the inquiry conducted into his competence was

inadequate under <u>Rees</u>.  It is Petitioner's contention that in order to satisfy <u>Rees</u>, the following questions must be answered:

> (1) Is the person suffering from a mental disease or defect?

> (2) If so, does it prevent him from understanding his legal position and the options available to him? And,

> (3) If the disease or defect does not prevent the person from understanding his legal position and available options, does it nevertheless prevent him from making a rational choice among his options?

<u>Ross ex rel. Smyth v. Lantz</u>, 392 F.Supp.2d 236, 238 (D.Conn. 2005) (citing <u>Rumbaugh v. Procunier</u>, 753 F.2d 395, 398 (5th Cir. 1985), and <u>Smith ex rel. Mo. Pub. Defender Comm'n v. Armontrout</u>, 812 F.2d 1050, 1057 (8th Cir. 1987)).  Because these questions were not explored, Petitioner contends that his depression was deemed irrelevant under Oklahoma's procedures.  Relying on a second report prepared by Dr. Russell in 2005, a year after his resentencing proceedings and a few months after he starting taking an antidepressant medication, Petitioner asserts that had these questions been asked in 2004, the answers would have demonstrated that his depression prevented him from making a rational choice among his options.

The OCCA addressed Petitioner's argument[11] and found as follows:

> Oklahoma's combination of questions which must be asked to determine competency, and which must be specifically asked where capital defendants wish to waive their statutory rights to a jury trial, presentation of mitigating evidence, and appeal, are comparable to [Petitioner's] proposed questions. A defendant whose mental disease or defect either prevents him from understanding his legal position and available options, or prevents him from making a rational choice among his options, will not be found competent under our current law.

Hooper, 142 P.3d at 470 (footnote omitted). Granting Petitioner's Rule 3.11 motion, the OCCA considered Dr. Russell's 2005 report and Petitioner's assertion that once he was medicated in 2005, he felt better and wanted to proceed with his appeals.[12] Id. at 470 n.18. However, the OCCA concluded that Petitioner had not shown that he "was unable to make a valid waiver due to a mental illness." Id. at 470.

> The record does indicate that defense counsel and a defense expert believed [Petitioner] to be suffering from chronic, serious depression. However, neither counsel nor the defense expert believed that his condition affected [Petitioner's] ability to make a valid waiver. The expert who performed the independent competency evaluation specifically found that [Petitioner], while

---

[11] Petitioner takes issue with the OCCA's characterization of his claim on appeal. As an introduction to its discussion of the merits of Petitioner's claim, the OCCA stated that Petitioner's primary contention is that "he is mentally ill and that his mental illness affected his ability to make a valid waiver." Hooper, 142 P.3d at 470. Petitioner contends that this statement is incorrect because he did not claim that he was currently mentally ill, but that he was mentally ill in 2004. Contrary to Petitioner's assertion, this is clearly not an unreasonable determination of the facts. Petitioner's very claim is that he suffers from depression, a mental illness. That his condition may be controlled by medication does not mean that he does not have the condition.

[12] Petitioner argues that the OCCA did not properly consider this evidence; however, the OCCA's decision makes clear that the evidence presented his Rule 3.11 motion was "evidence of his present mental health, bearing on his ability to make a valid waiver at the time of his resentencing proceedings" and was considered by the OCCA as part of its mandatory sentence review. Hooper, 142 P.3d at 470 n.18.

depressed, did not present with symptoms of a mental illness, and offered a rational basis for his decisions. Further, although the State's expert evaluation answers the standard competency questions, the evaluation itself explores [Petitioner's] competency specifically as it relates to the death penalty and capital punishment issues. [Petitioner] presents this Court with affidavits suggesting that now, after receiving medication and treatment, he would make a different choice. This material tells the Court what [Petitioner] might do now, faced with the same options he had at the time of his sentencing hearing. However, it does not show that [Petitioner] was unable to make a valid waiver at that time. The trial court thoroughly examined [Petitioner], and considered the expert evaluation and [Petitioner's] attorney's information, before determining [Petitioner] was competent to validly waive his rights to jury trial and mitigating evidence, and to appeal. As we find above, our current procedures protect the rights of a defendant who wishes to waive the rights to jury trial, presentation of evidence and appeals. [Petitioner] was competent to make a valid waiver. . . .

Id. at 470-71 (footnote omitted).

In order for Petitioner to obtain habeas relief on this claim, he must show that the OCCA's decision is contrary to or an unreasonable application of Rees. As the Supreme Court continues to acknowledge, this is a high hurdle to overcome. See Cullen v. Pinholster, ___ U.S. ___, 131 S.Ct. 1388, 1398 (2011) (acknowledging that Section 2254(d) places a difficult burden of proof on the petitioner); Richter, 131 S.Ct. at 786-87 ("As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded agreement."); Renico v. Lett, ___ U.S. ___, 130 S.Ct. 1855, 1866 (2010) ("AEDPA prevents defendants-and federal courts-from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts."); Woodford v. Visciotti, 537 U.S. 19,

24 (2002) (Section 2254(d) "demands that state-court decisions be given the benefit of the doubt."). Given the procedures employed and the in-depth inquiry conducted in Petitioner's case, the Court finds that Petitioner has not demonstrated his entitlement to relief.

The record discloses that the trial court "scrupulously followed" the comprehensive procedures established by the OCCA to address the constitutional implications of a death penalty volunteer. See Hooper, 142 P.3d at 466 (commending the trial court's actions). These procedures ensure that a capital defendant is competent and that his waivers are knowing and voluntary. As discussed in Godinez, this two-part inquiry is what is required in order for a defendant to waive his constitutional rights. "The focus of the competency inquiry is the defendant's mental capacity; the question is whether he has the ability to understand the proceeding." Id. at 401 n.12. Second, "a trial court must satisfy itself that the waiver of his constitutional rights is knowing and voluntary." Id. at 400. "The purpose of the 'knowing and voluntary' inquiry . . . is to determine whether the defendant actually does understand the significance and consequences of a particular decision and whether the decision is uncoerced." Id. at 401 n.12.

While Petitioner faults Oklahoma's process for not mirroring or at least including questions utilized in Ross by the United States District Court of Connecticut in its application of Rees,[13] the absence of these particular questions does not imply that Oklahoma's process

---

[13] Under the AEDPA, unreasonableness is judged according to Supreme Court authority. "The decisions of lower federal courts applying Supreme Court precedent are not determinative. . . ." Bland v. Sirmons, 459 F.3d 999, 1014 (10th Cir. 2006).

is invalid. Rees sets for the standard of competence required for a capital defendant to forego his appeal. Although Rees acknowledges that application of the standard will necessarily involve an evaluation of the defendant by a mental health expert, it does not mandate the procedure by which the determination is to be conducted. Rees, 384 U.S. at 314. See Godinez, 509 U.S. at 402 (acknowledging that "while States are free to adopt competency standards that are more elaborate than the Dusky formulation, the Due Process Clause does not impose these additional requirements").

In the present case, Petitioner was evaluated by a mental health expert appointed by the court. The questions posed to Dr. Roberson were the standard questions for determining competency. Hooper, 142 P.3d at 469 n.14 (citing Okla. Stat. tit. 22, § 1175.3(E) (2001)). Although Dr. Roberson answered these questions in detail, Petitioner contends that his focus was impermissibly limited to "competency to be sentenced," and he criticizes Dr. Roberson for not conducting any psychological testing.[14] Petition, p. 47. Petitioner also asserts that the OCCA made unreasonable determinations of fact with respect to Dr. Roberson's report.[15] Petition, pp. 46-49.

---

[14] Petitioner does not state what testing should have been done. In any event, it is unlikely that Petitioner would have submitted to any such testing. While Petitioner agreed to an assessment of his competency, he adamantly refused any psychological, neuropsychological, or psychiatric testing (O.R. X, 1682; Tr. 9/8/04, 10; 2005 Report of Dr. Russell, p. 3).

[15] It is unnecessary to specifically address each of Petitioner's contentions of unreasonably determined facts. For the reasons set forth herein, the Court finds that the OCCA reasonably determined the facts and rendered a decision which is not contrary to or an unreasonable application of Rees.

Dr. Roberson answered the questions posed by the court and provided the court with needed information about his mental health.[16] Judge Cunningham noted that Dr. Roberson's report was one of the most detailed reports he had ever reviewed. "I've read these reports for going on 24 years, . . . but I was surprised by the length of the report, by the detail of the report, by the cooperation of [Petitioner] with Dr. Roberson. I think this report addresses everything that we needed to have addressed in the nature of a forensic expert's statements to the Court based on his evaluation" (Tr. 7/22/04, 7). As the OCCA found, "although [Dr. Roberson's] evaluation answers the standard competency questions, the evaluation itself explores [Petitioner's] competency specifically as it relates to the death penalty and capital punishment issues." Hooper, 142 P.3d at 470.

Contrary to Petitioner's assertion, the fact that Petitioner was depressed during his resentencing proceeding does not foreclose a finding under Rees that he had the "capacity to appreciate his position and make a rational choice with respect to continuing or abandoning further litigation. . . ." Rees, 384 U.S. at 314. Rees states that any mental disorder must "substantially affect his capacity in the premises." Id. Thus, "the presence or absence of mental illness or brain disorder is not dispositive." Mata, 210 F.3d at 329 n.2.

_____

[16] While Dr. Roberson's evaluation was undoubtedly an important part of the competency determination, it was not the definitive conclusion. As even Rees acknowledges, Petitioner's competence was a matter for the court. Rees, 384 U.S. at 314. See also United States v. Ghane, 593 F.3d 775, 779 (10th Cir. 2010) ("In assessing a defendant's competency, the district court may consider various factors, including expert medical opinions *and its own observations of the defendant during the proceedings*.") (emphasis added). Thus, while Petitioner targets Dr. Roberson's evaluation for alleged deficiencies, it was but a part of the relevant evidence considered by the court in determining Petitioner's competence to proceed.

See also United States v. Mackovich, 209 F.3d 1227, 1233 (10th Cir. 2000) (the Tenth

Circuit has long recognized that a defendant is not necessarily incompetent simply because

he suffers from a mental disorder); Miles v. Dorsey, 61 F.3d 1459, 1474 (10th Cir. 1995)

("Petitioner's history of mental problems, low intelligence, psychotropic medication, and

substance abuse do not establish that he was incompetent to plea.").

In Smith, the Eighth Circuit rejected an interpretation of Rees that would find a

defendant incompetent upon a showing of only a "mere *possibility* that a mental disorder

substantially affected the decision." Smith, 812 F.2d at 1057.

> [T]here is necessarily an area of overlap between the category of cases in which at the threshold we see a possibility that a decision is substantially affected by a mental disorder, disease, or defect, and that of cases in which, after proceeding further, we conclude that the decision is in fact the product of a rational thought process.
>
> Furthermore, we think it probable, given the circumstances that perforce accompany a sentence of death, that in every case where a death-row inmate elects to abandon further legal proceedings, there will be a possibility that the decision is the product of a mental disease, disorder, or defect. Yet, Rees clearly contemplates that competent waivers are possible, . . . and there is little point in conducting a competency inquiry if a finding of incompetency is virtually a foregone conclusion.

Id. (citation omitted). In Smith, the Eighth Circuit affirmed the district court's finding of

competency despite a consensus among the experts that the petitioner suffered from

borderline personality disorder, antisocial personality disorder, and chronic mild-to-moderate

depression. Id. at 1054-55, 1058. See also Lochnar v. Zant, 978 F.2d 637, 642 (11th Cir.

1992) (finding a depressed petitioner competent under Rees).

In addition, there is no indication, as Petitioner suggests, that his depression was deemed irrelevant in the assessment of his competency. As previously noted, Petitioner's counsel repeatedly advised the court of his opinion that Petitioner was depressed. In addition, both experts who evaluated Petitioner were aware of his history of depression. Yet, all reached the same conclusion that Petitioner was competent. If Petitioner was in fact "malingering well," as his habeas counsel now asserts, he malingered very well. From all points of observation, from his counsel to his own expert, from the court-appointed expert to the court, Petitioner repeatedly demonstrated that he had the capacity to appreciate his position as well as a rational understanding of the decisions he was making. Like the petitioner in Rumbaugh, 753 F.2d at 403, who was also found competent to forego further legal proceedings, Petitioner "[strove] mightily to prove his mental competence to make legal decisions."

Moreover, as the OCCA found, Petitioner's subsequently developed evidence regarding his depression is insufficient to overcome the vast evidence of his competence at the time of his resentencing proceedings. See Hooper, 142 P.3d at 470 ("This material . . . does not show that [Petitioner] was unable to make a valid waiver at [the time of his sentencing hearing]."). Petitioner's primary evidence in this regard is the re-evaluation conducted by Dr. Russell in 2005. Although Dr. Russell found Petitioner to be in essentially the same condition as when she evaluated him in 2004, she states that "in working with [Petitioner] knowing what I now know, I obviously would have approached the case

differently." The only reported difference, however, between the first evaluation and the second is that Petitioner had been on an antidepressant medication for approximately two months before the second interview, and that, "[d]espite a previously reported normal mood," Petitioner told Dr. Russell that the medicine makes him "'feel[] better" and makes him now want to pursue an appeal (2005 Report of Dr. Russell, pp. 4-6). Based on this information supplied by Petitioner, Dr. Russell's most recent conclusion is that when Petitioner's depression is symptomatic, as she now opines it was in 2004, he is unable to make a rational choice among his options (2005 Report of Dr. Russell, p. 5).

"[A] state court's conclusion regarding a defendant's competency is entitled to [] a presumption [of correctness on federal habeas review]." Demosthenes v. Baal, 495 U.S. 732, 735 (1990). See Bryan v. Gibson, 276 F.3d 1163, 1170 (10th Cir. 2001) (citing Baal and 28 U.S.C. § 2254(e)(1)). To overcome the presumption, a petitioner must present "clear and convincing evidence that [he] was in fact incompetent. . . ." Bryan, 276 F.3d at 1170. Judge Cunningham found Petitioner competent and the OCCA affirmed this finding. Petitioner's "new" evidence, evidence which was even considered by the OCCA, is insufficient to overcome these determinations.

The only Tenth Circuit case applying Rees is Hays v. Murphy, 663 F.2d 1004 (10th Cir. 1981). While Petitioner contends that Hays supports his request for relief, the Court disagrees. In addition to the fact that Hays is a pre-AEDPA case, where deference to the OCCA was not implicated, Hays is distinguishable on its facts. In Hays, there was

significant evidence indicating that Hays suffered from a serious mental disorder. Hays's mental problems, which predated his crime, resulted in "several mental commitment proceedings over a period of years. . . ." Id. at 1009. Hays had "suicidal tendencies, lengthy alcoholism, and . . . delusions." Id. at 1009-10 (footnote omitted). Hays had a history of paranoid schizophrenia, and he exhibited bizarre, inappropriate, and possibly psychotic behavior. Id. at 1010.

There were two state court judicial inquiries into Hays's desire to forego further legal proceedings; however, neither addressed his competency. The first was conducted by a special referee appointed by the OCCA. Because Hays remained silent and refused to answer the questions posed by the referee, the referee concluded that Hays did not affirmatively waive his right to appeal. Id. at 1006 & n.1. The second was a hearing before the OCCA. After a brief question and answer session, the OCCA concluded that Hays affirmatively waived his rights and it denied a stay of execution. Id. at 1007 & n.3. Regarding the OCCA's actions with respect to Hays's competency, the Tenth Circuit noted as follows:

> After some evidence and comments concerning competence were presented to it, the Court of Criminal Appeals ruled that such evidence was irrelevant to the proceedings before it. Thus, the state court actually did not make a competency finding, or a finding on the sufficiency of the evaluations of Mr. Hays's competence.

Id. at 1007 n. 4 (citation omitted).

The Tenth Circuit found "that the examinations and evaluations of Mr. Hays were insufficient for a determination on the critical question of competency." Id. at 1009. The

Court noted that "[m]anifestations of schizophrenia 'are present one day and not the next. They are revealed to one examiner and not to another. . . . A complete account of a patient's symptomatology, therefore, demands that he be observed over an extended period of time.'" Id. at 1012 n.13 (citation omitted). Thus, although Hays had been seen by mental health experts "over a long period of time, none [of their contact with Hays] revealed the type of extended, close observation in a proper setting which is generally recognized as essential for the psychiatric and psychological evaluations required [to diagnose schizophrenia]." Id. at 1011-12 (footnote omitted). The Court also noted that "'[i]n most clinical centers certain psychological test batteries are routinely used to indicate, confirm, or rule out a diagnosis of schizophrenia.'" Id. at 1012 n.14 (citation omitted). The record did not show that Hays had been administered any psychological tests. Id. at 1012. Because of these deficiencies, the Tenth Circuit remanded the matter for further evaluation. Id. at 1013.

Petitioner's case is different from Hays in two major respects. First, in Hays, the state court did not make any determination of competency. In fact, the issue of Petitioner's competence was all but overlooked. The OCCA even acknowledged in Petitioner's case that "the minimal state procedures used to uphold competency [in Hays] would not be adequate under current law." Hooper, 142 P.3d at 470 n.17. Unlike Hays, the inquiry into Petitioner's competence and his ability to make knowing and intelligent waivers of his constitutional rights was thoroughly and repeatedly explored. Petitioner was evaluated by two mental health experts at the time of his resentencing and both concluded that he was competent. This is in

addition to the representations of Petitioner's counsel and the observations of the trial court. Second, the facts are markedly different. In <u>Hays</u>, the petitioner had a long history of schizophrenia. One expert found that this mental illness "impair[ed] [his] ability . . . to appreciate reality and to exercise sound judgment, to the point where in certain areas his judgment may be based entirely on irrational delusion which the patient himself cannot perceive and over which he has no control." <u>Hays</u>, 663 F.2d at 1010 n.10. Another expert noted that Hays did "'not seem to understand that he is going to die.'" <u>Id.</u> at 1010 n.11. In Petitioner's case, there was a complete lack of evidence that Petitioner was irrational or delusional. Just the opposite, there was abundant evidence that he understood the nature and consequences of his resentencing proceeding and made rational decisions in the course thereof.

Having reviewed the OCCA's decision in light of the deference to which it is entitled, the Court finds that Petitioner has failed to show that it is an unreasonable application of <u>Rees</u> and/or an unreasonable determination of the facts. As applied in this case, Oklahoma's procedure for death penalty volunteers is constitutionally sound and consistent with <u>Rees</u>. Accordingly, Petitioner is not entitled to relief on his Ground One.

**B.      Grounds Two, Three, and Four.**

In his Grounds Two, Three, and Four, Petitioner raises claims relating to the manner in which his resentencing was conducted, particularly the court's consideration of evidence presented at his first trial. In Ground Two, Petitioner asserts that the court should not have

been permitted to review and rely upon the transcripts from his first trial without a showing by the State that the witnesses were unavailable. In Ground Three, Petitioner asserts that he was denied his right to a fair trial, right to be present, and right to counsel by the court's out-of-court consideration of the transcript evidence, and in Ground Four, Petitioner complains about hearsay testimony contained in the transcripts. Petitioner presented these claims to the OCCA, but the OCCA found that the claims were waived due to Petitioner's waiver of his appellate rights. Hooper, 142 P.3d at 471. Respondent asserts that these grounds are procedurally barred. Petitioner, referring back to his Ground One, asserts that his waiver was invalid and therefore these grounds should not be procedurally barred, but should be addressed on the merits. Having denying Petitioner relief on his Ground One, the Court finds that Petitioner's Grounds Two, Three, and Four are procedurally barred.

In denying Petitioner relief on his Grounds Two, Three, and Four, the OCCA held as follows:

> We have found that [Petitioner] entered a valid waiver of his right to a direct appeal from his sentences of death. Simply put, by this waiver [Petitioner] gave up the right to contest evidentiary issues arising in the resentencing trial. In Propositions II, III, and IV [Petitioner] complains of particular evidence, or categories of evidence, which he argues the trial court should not have considered. [Petitioner] has waived these claims and we do not consider them.

Id. (footnote omitted). "Claims that are defaulted in state court on adequate and independent state procedural grounds will not be considered by a habeas court, unless the petitioner can demonstrate cause and prejudice or a fundamental miscarriage of justice." Smith v.

Workman, 550 F.3d 1258, 1274 (10th Cir. 2008). Petitioner does not challenge the adequacy or independence of the state procedural rule applied in his case. Petitioner's only challenge to the application of a procedural bar to his Grounds Two, Three, and Four is the adequacy of the waiver of his appellate rights. See Reply, p. 31 ("[T]he resolution of Ground One is determinative of the issues in Ground[s] Two, Three, and Four."). Therefore, having found that the OCCA did not unreasonably determine that Petitioner knowingly and intelligently waived his right to appeal, the procedural bar to his Grounds Two, Three, and Four is valid as well and precludes this Court from consideration of their merits. Grounds Two, Three, and Four are denied.

### C. Ground Five.

In his Ground Five, Petitioner requests cumulative review of his Grounds One through Four. Although Petitioner acknowledges that this claim is unexhausted, the Court finds that dismissal of the claim on the merits is the easier course. See 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."). Smith v. Mullin, 379 F.3d 919, 927 (10th Cir. 2004) ("Where an issue 'may be more easily and succinctly affirmed on the merits,' judicial economy counsels in favor of such a disposition.'") (citation omitted).

"Cumulative-error analysis applies where there are two or more actual errors." Hoxsie v. Kerby, 108 F.3d 1239, 1245 (10th Cir. 1997). See United States v. Rivera, 900 F.2d 1462,

1469 (10th Cir. 1990) ("The cumulative effect of two or more individually harmless errors has the potential to prejudice a defendant to the same extent as a single reversible error. The purpose of a cumulative-error analysis is to address that possibility."). Because the Court has found no error, cumulative-error analysis has no application, and Petitioner's Ground Five is denied. See Bunton v. Atherton, 613 F.3d 973, 990 (10th Cir. 2010) ("[T]he cumulative error doctrine does not apply here because we have not found the existence of two or more actual errors."); Alverson v. Workman, 595 F.3d 1142, 1162 (10th Cir. 2010) ("Because we have rejected each of [Petitioner's] substantive claims of constitutional error, there can be no cumulative error.").

## IV. Conclusion.

After a thorough review of the entire state court record, the pleadings filed herein, and the applicable law, the Court finds that Petitioner is not entitled to his requested relief. Accordingly, Petitioner's Petition, Doc. 21, is hereby **DENIED**. A judgment will enter accordingly.

IT IS SO ORDERED this 20th day of May, 2011.


VICKI MILES-LaGRANGE
CHIEF UNITED STATES DISTRICT JUDGE